**David D'Addio**
**Nita K. Klunder**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
617-573-4526 (David D'Addio)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>　　　　　　　　Plaintiff,<br>　v.<br><br>MARK BORDEN,<br>　　　　　　　　Defendant. | Civil Action No. 24-cv-2621 (____)<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against the defendant:

## SUMMARY

1.　Defendant Mark Borden, an attorney based in Canada, engaged in the business of being a broker by selling penny stocks on behalf of his customers without either registering with the Commission as a broker or being associated with a registered broker, as required by U.S. federal securities laws.

2.　Borden's business included: (a) taking possession of his customers' penny stocks; (b) drafting documents purporting to transfer ownership of those shares to himself or his law firm and providing those documents to transfer agents; (c) depositing those shares in

accounts Borden held at various brokerage firms; (d) selling those shares at the direction of his customers, often coordinating with the timing of his customers' paid campaigns to promote the stock in order to encourage retail investors to buy the stock; (e) charging his customers a commission based on a percentage of the stock sale proceeds; and (f) disbursing stock sale proceeds to his customers.

3. In 2017, Borden took on Charlie Abujudeh, a resident of California who was previously charged by the Commission with securities fraud, as a customer. Due to restrictions for depositing low liquidity penny stocks with U.S.-based brokerage firms, Abujudeh began looking for brokerage firms in Canada, most of which required accounts to be opened by a Canadian citizen. Over the next five years, Borden took possession of Abujudeh's stock in dozens of issuers of stock (often referred to simply as "issuers"), deposited that stock in his brokerage firm accounts, and sold that stock on behalf of Abujudeh. For his services, Borden retained at least eight percent of the stock sale proceeds. Between May 2018 and April 2021, Borden sent Abujudeh over $15 million generated from the sale of Abujudeh's stock. Abujudeh was just one of Borden's customers.

4. By engaging in the conduct alleged herein, Borden violated, and unless restrained and enjoined will continue to violate, Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78o(a)(1)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5. The Commission seeks a permanent injunction against the defendant, enjoining him from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint, disgorgement of ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest; civil penalties pursuant to Section 21(d)(3) of the

Exchange Act [15 U.S.C. §78u(d)(3)]; an order barring the defendant from participating in any offering of a penny stock, pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)]; and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

7. Defendant made use of the mails or means or instrumentalities of interstate commerce in connection with the acts, practices, transactions, and course of business alleged in this Complaint.

8. Venue lies in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Eastern District of New York. For example, several individuals residing in the Eastern District of New York purchased the stock of TransGlobal Assets, Inc., V Group, Inc., and Scepter Holdings, Inc. during the time that Borden was selling that stock on behalf of Abujudeh.

## DEFENDANT

9. Mark Borden, age 50, is an attorney licensed to practice law in Canada and a resident of Thornhill, Ontario, Canada.

## RELATED INDIVIDUALS AND ENTITIES

10. Charlie Abujudeh, age 50, is California resident. The Commission charged Abujudeh for his role in the fraudulent sale of Scepter stock, among others, including the stock of Odyssey Group International, Inc. *See SEC v. Charlie Abujudeh*, 21-cv-04110-PKC (E.D.N.Y. 2021). A judgment was entered against Abujudeh on January 20, 2023, after he

3

consented to the entry of a judgment. In a parallel criminal case, Abujudeh pleaded guilty to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. §371 for his role in the promotion and sale of Odyssey Group International, Inc. stock. *See United States v. Charlie Zaki Abujudeh*, 22-cr-00161 (E.D.N.Y. 2022).

11. Scepter Holdings, Inc. ("Scepter") describes itself as managing "the sales and brand development of high-performance consumer packaged goods." Scepter (Ticker: BRZL) trades on OTC Link. Scepter was incorporated in 2007 in Nevada, and has executive offices in Las Vegas, Nevada.

12. V Group, Inc. describes itself as "a manufacturer of consumer beverage products." V Group (Ticker: VGID) trades on OTC Link. V Group was incorporated in 2014 in Oklahoma, and has its principal executive office in Carlsbad, California.

13. TransGlobal Assets, Inc. ("Transglobal") described itself as "a self-sustaining Hemp Ranch" during the period of the conduct alleged herein. TransGlobal (Ticker: TMSH) trades on OTC Link. TransGlobal was incorporated in 2007 in Nevada and was redomiciled to Wyoming in 2013, and has its principal executive office in Cheyenne, Wyoming.

14. Vivakor, Inc. described itself as "a socially responsible operator, acquirer and developer of clean energy technologies and environmental solutions." Vivakor (Ticker: VIVK) trades on OTC Link. Vivakor was incorporated in Nevada, and has its principal executive office in Salt Lake City, Utah.

## FACTS

**I.   Borden Acted as an Unregistered Broker for Abujudeh and Others.**

15. Abujudeh accumulated and sold numerous penny stocks, often while paying to promote that stock to retail investors. Stock promotion campaigns are typically designed to

encourage retail investors to buy a stock, often for the purpose of increasing or maintain the stock price or volume of trading in the stock, and they are sometimes used by parties like Abujudeh as part of a scheme to fraudulently sell stock.

16. A "penny stock" is defined in Section 3(a)(51) of the Exchange Act and in Rule 3a51-1 thereunder as an equity security that does not meet certain exemptions—essentially, most stocks that do not trade on a national securities exchange, that trade under $5 per share, and whose issuers do not meet certain thresholds of tangible assets or revenue.

17. At all times relevant to this Complaint, the securities of Scepter, V Group, Transglobal, and Vivakor were penny stocks.

18. At some point in 2016, the U.S. brokerage firm Abujudeh had been using to deposit and sell his penny stocks stopped accepting deposits. Abujudeh identified a firm in Canada ("Canadian Firm 1") that would deposit his stock, but only if his account was opened in the name of a Canadian citizen.

19. Canadian Firm 1 recommended that Abujudeh retain Borden for this purpose, noting that it had successfully referred others to Borden for the same purpose. Abujudeh followed Canadian Firm 1's recommendation and by 2017, retained Borden to serve as his broker.

20. Borden and Abujudeh discussed the services Borden would provide, including: (a) taking possession and nominal ownership of his Abujudeh's penny stocks; (b) drafting and executing documents purporting to transfer ownership of those shares to Borden or his law firm; (c) depositing those shares in accounts Borden held at various brokerage firms; (d) selling Abujudeh's stock at Abujudeh's direction, and in coordination with the timing of Abujudeh's campaigns to promote the stock; (e) charging Abujudeh a commission based on a percentage of

the stock sale proceeds; and (f) disbursing stock sale proceeds to Abujudeh. Abujudeh and Borden negotiated Borden's commission, which ranged from 8% to 16% of the stock sale proceeds, depending on the security.

21. In order to transfer the stock to Borden, Abujudeh and Borden executed stock purchase agreements or stock assignments for each security. Abujudeh transferred his stock either to Borden individually, or to Borden's law firm, Borden Family Lawyers—a distinction that made little difference to Borden. As Borden explained to Abujudeh in an email about one issuer, "I put [the stock] in my firm name as it is easier to have money deposited and cleared that way but you can change it to my personal name if you want."

22. Notwithstanding these arrangements, which brokerage firms required for Borden to deposit and sell the shares, Borden and Abujudeh understood from the start of their relationship that Abujudeh remained, at all times, the beneficial owner of the stock. After selling Abujudeh's stock for him, Borden transmitted the stock sale proceeds back to Abujudeh, less fees and Borden's commission.

23. Moreover, Borden entered written agreements with Abujudeh expressly identifying Abujudeh (or one of the entities Abujudeh controlled) as the "Beneficial Owner" of Abujudeh's stock, despite the fact that the shares would be "vested in the name of Mark Borden." The agreements also described the specific commission Borden charged for selling Abujudeh's stock.

24. Various other aspects of Borden's business were also memorialized in written agreements with his customers. In one document titled "Assignment/Commission Agreement," for example, Abujudeh and Borden agreed that once the subject "shares are assigned and transferred to Borden Family Lawyers[,] they will be deposited to the credit of the trading

account of Borden Family Lawyers and thereafter sold on the open market. The net proceeds of sale of all of the shares of each company shall be paid and transferred to [Abujudeh] after Borden Family Lawyers has retained a commission in the total amount of 8% on all sales." Borden entered similar types of agreements with other customers.

25. Borden and Abujudeh stayed in frequent contact via phone, email, and the encrypted messaging app Telegram regarding Abujudeh's stock and Borden's efforts to deposit and sell it on Abujudeh's behalf.

26. Borden opened accounts at multiple brokerage firms in order to serve Abujudeh and his other customers. For example, in or around the fall of 2017, Canadian Firm 1 no longer accepted deposits of stock. As a result, Borden opened an account at a second Canadian brokerage firm ("Canadian Firm 2"). Borden also opened at least one more account in June 2020 at another Canadian brokerage firm ("Canadian Firm 3") for the purpose of depositing and selling the stock of Abujudeh and Borden's other customers.

## II. Borden Deposited and Sold Millions of Dollars of Stock for His Customers.

27. Between May 2018 and April 2021, Borden sent Abujudeh over $15 million generated from selling Abujudeh's penny stocks from his three brokerage accounts. Those stock sales included:

    a. Nearly half a billion shares of V Group Inc., which Borden sold for more than $1.3 million in just over one month. V Group stock was the subject of a paid promotional campaign at the time of Borden's sales; and

    b. More than 65 million shares of Scepter, which Borden sold for $344,395 in less than a month. Scepter stock was the subject of a paid promotional campaign at the time of Boden's sales.

28. Borden's unregistered broker business was substantial. In a 6-month period from November 2020 to April 2021, for example, Borden sold from just one of his brokerage accounts more than 8 billion shares of stock from 26 different issuers on behalf of his customers, generating approximately $15.5 million dollars in proceeds.

29. As noted, Borden sold stock on behalf of multiple customers in addition to Abujudeh. From December 2019 through January 2020, for example, Borden used accounts at Canadian Firm 1 and Canadian Firm 2 to obtain, deposit, and sell at least three million shares of Vivakor Inc. for another customers ("Customer #2"). These sales generated at least $700,000 in proceeds before commission and fees.

30. In March of 2021, another Customer ("Customer #3"), directed Borden, through Abujudeh, to sell 20 million of shares of Transglobal. Borden sold Customer #3's shares and sent via wire approximately $200,000 in stock sale proceeds (having deducted his commission and fees) to Customer #3. Transglobal stock was the subject of a paid promotional campaign at this time.

### III. Borden's Unlawful Activity Caused Investor Harm.

31. Borden understood in many cases the stock he was selling on behalf of Abujudeh was being sold into the demand created by stock promotional campaigns paid for by Abujudeh. The two coordinated the timing of Borden's sales to coincide with the stock promotional activity paid for by Abujudeh.

32. Abujudeh instructed Borden to sell as much stock as he could without negatively impacting the price—generally about twenty to thirty percent of the market volume.

33. The stock promotional campaigns Abujudeh sponsored were part of an ongoing scheme in which Abujudeh hired stock promoters to promote his penny stocks to retail investors

without disclosing that Abujudeh controlled most of the shares of these issuers that were deposited with brokerage firms and available for trading (the stock "float"); that he was paying for the promotions; or that he intended to sell his shares into the demand generated by the promotions.

34. Abujudeh sponsored stock promotional campaigns for Scepter, Transglobal, and V Group which artificially inflated the price of each stock during the time Borden sold shares of these issuers on behalf of Abujudeh and others. Borden's sale of Scepter, TransGlobal, and V Group stock accordingly resulted in investor harm.

35. Borden was also aware that other Customers were directing him to sell shares on their behalf during paid promotional campaigns.

**CLAIM FOR RELIEF**
**ACTING AS AN UNREGISTERED BROKER**
**(Violation of Section 15(a)(1))**

36. Paragraphs 1 through 35 above are re-alleged and incorporated by reference as if fully set forth herein.

37. By engaging in the conduct alleged above, Borden acted as a broker within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. §78c(4)], and made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities.

38. With respect to the securities transactions at issue, Borden was not registered with, or an associated person of a firm registered with, the Commission.

39. Borden did not qualify for an exemption from the registration requirements.

40. By reason of the foregoing, Borden violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A. Permanently restrain Defendant, his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

B. Order the Defendant to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

C. Order the Defendant to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D. Enter an order barring the Defendant from participating in any offering of a penny stock, pursuant to 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F. Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED this 8th day of April, 2024.

Respectfully submitted,

*/s/ David D'Addio*
David D'Addio
Nita K. Klunder

Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
617-573-4526 (D'Addio)